# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 16-0224V
Filed: September 19, 2017
UNPUBLISHED

* * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| LINDSEY DESROSIERS, | * | |
| | * | |
| Petitioner, | * | Ruling on Pain & Suffering; Concession; |
| v. | * | Tetanus-Diphtheria-Acellular-Pertussis |
| | * | Vaccine ("Tdap"); Shoulder Injury |
| SECRETARY OF HEALTH | * | Related to Vaccine Administration |
| AND HUMAN SERVICES, | * | ("SIRVA"); Special Processing Unit |
| | * | ("SPU") |
| Respondent. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

*Paul R. Brazil*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*David Gregory Cutler*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On February 16, 2016, Lindsey Desrosiers ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury as a result of a tetanus-diphtheria-acellular-pertussis ("Tdap") vaccine she received on March 9, 2015. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

It has already been determined that petitioner is entitled to compensation for her vaccine-related injury, and the only issue currently before the undersigned is the amount of damages that petitioner should be awarded in compensation for pain and suffering. As detailed below, the undersigned finds that an award of $85,000.00 represents a fair and appropriate amount of compensation for petitioner's past and future pain and suffering.

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I. **Procedural History**

On May 12, 2016, respondent filed his Rule 4(c) report in which he conceded that petitioner was entitled to compensation in this case. Respondent's Rule 4(c) Report at 1. On September 1, 2016, the undersigned issued a ruling on entitlement finding petitioner entitled to compensation for her SIRVA (shoulder injury related to vaccine administration) injury. The parties then began the process of negotiating the appropriate amount of damages.

On June 22, 2016, petitioner filed a status report stating the parties were unable to reach an agreement on damages. On July 1, 2016, the staff attorney managing this case held a status conference to address the parties' concerns. The parties explained that the issue of disagreement was on the appropriate amount to award petitioner for her pain and suffering. After discussing several available options, the parties filed a status report on September 1, 2016, stating that they conferred and requested 60 days to file briefs on damages. The parties filed simultaneous briefs discussing the damages issues in this case. This case is now ripe for a determination regarding petitioner's pain and suffering and award of damages.

II. **Fact History**

Petitioner received a Tdap vaccine in her left shoulder on March 9, 2015, at South County Hospital in East Greenwich, Rhode Island during her six-month pregnancy check-up. Petitioner's Exhibit ("Pet. Ex.") 1 at 2; Pet. Ex. 5 at 1, ¶3. At the time, she was employed as a pharmacist at CVS Pharmacy. Petitioner's medical history was significant for hypercholesterolemia, a left elbow fracture, Raynaud's syndrome and chronic left hip pain. Pet. Ex. 2 at 20; Pet. Ex. 4 at 2. Petitioner had no history of shoulder problems at the time of vaccination.

Two weeks later, on March 24, 2015, petitioner presented to Arlene Kavanagh, PA-C, and Dr. Ramin Tabaddor at South County Orthopedics for complaints of left shoulder pain. Pet. Ex. 2 at 18-19. Petitioner complained that she had been feeling pain in her left shoulder since receiving the Tdap vaccine which she believed was given too high in her arm. *Id.* On examination, Dr. Tabaddor noted that there was no soft tissue swelling, skin lesions, lacerations or ecchymosis. Petitioner had a full range of motion of the shoulder with discomfort beyond 45 degrees in forward flexion and abduction. *Id.* Testing was limited due to petitioner's discomfort with the procedure. Dr. Tabaddor noted that the onset was "sudden with injury which occurred on 3/9/2015." *Id.* at 19. In his assessment, Dr. Tabaddor advised petitioner that preserving her range of motion would be important and provided her with a referral for physical therapy (Pet. Ex. 2 at 29). Dr. Tabaddor also instructed her to perform home exercises on her own. Petitioner was to follow up in four weeks. *Id.*

On March 30, 2015, petitioner presented to Alison E. Fisher, DPT, at OPT Physical Therapy and Sports Medicine for a general evaluation. Pet. Ex. 7 at 1. Petitioner reported that her left shoulder had been painful since her Tdap injection, that she had trouble falling asleep, and she felt weakness and difficulty moving her arm at times. *Id.* On examination, petitioner's range of motion was noted to be limited in her left shoulder on flexion, abduction, external and internal rotation. *Id.* She also had

decreased strength in her left shoulder. *Id.* Petitioner was prescribed a course of physical therapy. *Id.* at 2.

On April 9, 2015, Ms. Fisher noted that petitioner "no longer [had] pain into shoulder flexion," and that "[patient] is making gains in painfree shoulder ROM." Pet. Ex. 7 at 6. During an April 16, 2015 PT visit with Ms. Fisher, petitioner reports that she noticed less pain in her shoulder since starting physical therapy. Pet. Ex. 7 at 8. She was only experiencing pain with certain movements and was able to use her left arm more since starting physical therapy. *Id.* Petitioner did state that she was having trouble lifting her daughter and reaching laterally and behind her back. *Id.* The objective assessment notes from that visit show that petitioner's range of motion and strength in her left shoulder were improving. *Id.*

On April 21, 2015, petitioner again presented to Ms. Kavanagh and Dr. Tabaddor for a follow-up appointment. Pet. Ex. 2 at 16. Petitioner reported that she experienced some improvement in her symptoms since her last appointment. *Id.* at 17. However, she was still experiencing pain. Petitioner was using ice and heat as needed. On examination, Dr. Tabaddor again noted no soft tissue swelling, skin lesion, lacerations or ecchymosis. Petitioner had a full range of motion with discomfort on full flexion and abduction. *Id.* She had negative results on the Speed and Hawkins tests but positive indications on Neer, empty can and O'Brien tests. *Id.* Dr. Tabaddor noted in his assessment that he believed petitioner suffered rotator cuff tendinopathy and impingement as a result of her Tdap shot. He further noted that petitioner was improving with physical therapy. Petitioner was not interested in an MRI or MR arthrogram because she was pregnant. She was instructed to follow up in six weeks. *Id.*

During PT visits on April 23 and April 28, 2015, petitioner reported that she only felt pain in left shoulder with certain movements and activities such as driving. Pet. Ex. 7 at 11. On May 5, 2015, petitioner again reported that her left shoulder was only painful with certain movements. *Id.* at 14. By May 14, 2015, petitioner reported that while she continued to have increased pain with lateral reaching and reaching behind her back, she was now able to lift her daughter with less pain. *Id.* Petitioner was discharged from physical therapy on May 14, 2015, because "[t]he patient will no longer benefit from skilled PT interventions." *Id.* at 18.

On June 1, 2015, petitioner presented to Dr. Tabaddor for a follow-up appointment. Petitioner noted that she was still experiencing pain in her left shoulder but that she was continuing to see some improvement in her symptoms. Pet. Ex. 2 at 14. She had attended physical therapy and now had a better range of motion. *Id.* Petitioner was not taking any medication at that time for her pain. *Id.* On inspection of the left shoulder, Dr. Tabaddor noted that she had full range of motion and results of the Hawkins, Yergason and Speed tests were all negative. She did have positive signs on the Neer test but Dr. Tabaddor noted that petitioner had "full strength throughout" her left shoulder. *Id.* Dr. Tabaddor noted that petitioner still had pain along the supraspinatus and that it was "most likely from her tetanus injection into the muscle itself." *Id.* Petitioner was instructed to follow up in 4-5 weeks for a repeat clinical evaluation to assess her condition. *Id.*

Petitioner next presented to Dr. Tabaddor and Ms. Kavanagh for a follow-up appointment on July 7, 2015. Pet. Ex. 2 at 12. Petitioner stated she had a flare up in her left shoulder approximately one week prior. She was unsure if she strained her shoulder or if her pain was caused by holding her one-month old baby. Petitioner stated that she was attending physical therapy and using ice and heat to treat her pain. *Id.* On examination, Dr. Tabaddor noted that petitioner had full range of motion in flexion, extension, abduction, and internal/external rotation. *Id.* at 13. She also had full strength in the supraspinatus, infraspinatus and subscapularis tendons. She had a positive result on the Neer's test but negative findings on the O'Brien, empty can, and Yergason, Speed, Hawkins and crossover tests. In his assessment, Dr. Tabaddor acknowledged that petitioner continued to experience pain in her left shoulder, but that she would continue working with physical therapy to treat her pain. *Id.* She was scheduled to follow up in four weeks.

On August 3, 2015, petitioner presented to Dr. Tabaddor for complaints of pain in her right hip and left shoulder. Petitioner stated that her left shoulder pain felt the same and that she was taking Ibuprofen for pain management. Pet. Ex. 2 at 10. At this time, petitioner was attending physical therapy once a week for both her left shoulder and right hip. On examination, petitioner's left shoulder showed no signs of soft tissue swelling, skin lesions, lacerations, or ecchymosis. She had a full range of motion of the shoulder and negative results on the Speed, Neer, Hawkins, Yergason, O'Brien and empty can test. *Id.* at 11. Petitioner had "near full strength throughout [the] supraspinatus and infraspinatus musculature." *Id.* Petitioner told Dr. Tabaddor that her left shoulder continued to be painful but she started her own gym exercise program. *Id.* Dr. Tabaddor recommended that petitioner discuss her gym program with her physical therapist to ensure she was not causing any increase in pain. *Id.* She was instructed to follow up in six to eight weeks. *Id.*

On September 21, 2015, petitioner presented to Dr. Tabaddor for a follow-up examination. Pet. Ex. 2 at 8. Petitioner complained of pain in her left shoulder and stated that physical therapy had afforded some relief, but that she was no longer attending. Petitioner stated that she periodically took ibuprofen for the pain. *Id.* at 8-9. Upon examination, Dr. Tabaddor noted that petitioner's left shoulder showed no signs of soft tissue swelling, ecchymosis or skin lesions. He noted that she had full range of motion of the shoulder, but that there was a "palpable defect at the deltoid laterally*." Id.* at 9. The results of the Neer and Hawkins tests were negative. In his assessment, Dr. Tabaddor noted that petitioner had continued to experience pain along her left shoulder and right hip for a "considerable amount of time." He noted that her left shoulder pain began after she received a tetanus shot "too superior" into her deltoid. He again notes that petitioner had "a palpable defect at the area of the deltoid" and that [h]er impingement signs" were still present. *Id.* Dr. Tabaddor ordered an MRI of petitioner's right hip and left shoulder to better evaluate her condition. *Id.*

Petitioner underwent an MRI of her left shoulder on October 2, 2015. Pet. Ex. 2 at 24; Pet. Ex. 3 at 2. The MRI revealed mild tendinosis of the rotator cuff and minimal subacromial subdeltoid bursitis*. Id.*

On October 6, 2015, petitioner returned for a follow-up visit with Dr. Tabaddor. Pet. Ex. 2 at 5-7. Petitioner continued to complain of pain in her right hip and left shoulder. Upon examination, Dr. Tabaddor noted that petitioner had no soft tissue

swelling ecchymosis, or skin lesions. Pet. Ex. 2 at 6. The empty can, Hawkins, Neer, Speed and O'Brien tests were negative. It was noted that petitioner's shoulder was "non-tender throughout" and she had "full range of motion of the shoulder." Dr. Tabaddor's assessment was that petitioner had "no obvious abnormality or defect" of her left shoulder and right hip. Dr. Tabaddor recommended that petitioner continue to monitor and observe her condition and follow up when needed. Pet. Ex. 2 at 7.

On August 29, 2016, petitioner filed an affidavit and an affidavit from her husband. Pet. Exs. 5-6. Petitioner describes that she felt "extreme pain" in her left shoulder immediately following her vaccination. She stated that being a pharmacist who routinely administers vaccines, she knew right away that the placement of the vaccine was too high on her shoulder. *Id.* Petitioner explains that when she went to South County Orthopedics, "Dr. Tabaddor was unable to offer [her] cortisone injections, prescriptions for pain medication, or an MRI. Instead, he gave me a series of physical therapy exercises for my shoulder." *Id.* at 1, ¶5. Petitioner states she had "little success" with physical therapy and that she became upset because there was little she could do for the pain while pregnant. *Id.* at 2, ¶7. As a result, she was unable to pick up her daughter from her crib, vacuum the floors around her house or even dress herself. *Id.* at ¶8. When her son was born, petitioner's shoulder injury affected her ability to perform "the most basic duties of a new mother" including nursing and comforting her child. *Id.* at ¶9. After her son was born, petitioner underwent an MRI which shows she had tendinosis of her supraspinatus and infraspinatus as well as fluid collection in her subacromial bursa. *Id.* at ¶10. When she followed up with Dr. Tabaddor regarding her MRI results, he told her that there was little he could do to help her injury. *Id.* at 2-3, ¶11. Petitioner states that her abilities as a pharmacist, wife and mother have changed significantly and that she is no longer physically active. She continues to have pain and discomfort in her left shoulder to this day. *Id.* at 3, ¶12.

Petitioner's husband, Daniel Desrosiers, states in his affidavit that petitioner "began complaining of pain before we even left the doctor's office." Pet. Ex. 6 at 1. He states that petitioner lost all functional use of her shoulder and that it was necessary for him to assist her to do "anything and everything" that required the use of two hands. *Id.* This included lifting, feeding or dressing their one-year old daughter. Mr. Desrosiers also stated that his wife's physician told them that because of the pregnancy, petitioner's treatment options were limited. After petitioner gave birth to their child and underwent an MRI, Dr. Tabaddor told them that her shoulder was "so inflamed that it could have caused permanent damage to her left shoulder." *Id.* at 1-2, ¶6. Mr. Desrosiers explains that his wife's injury forced him to take care of the children so that she could rest and that he observed her in pain and stressed from her injury. *Id.* at ¶8.

### III.  <u>Contentions of the Parties</u>

Respondent argues that based on the record in this case, it appears that petitioner had a mild should injury and recovered after just seven months. Respondent's Brief ("Resp. Brief") at 1. Respondent notes that although petitioner argues that her shoulder pain is severe, physically inhibiting, and likely permanent, the medical records do not support her assertions and thus do not permit a pain and suffering award near the upper end of the compensation scale. *Id.* at 5. Respondent further argues that:

5

> petitioner's medical records are marked by the absence of significant pain, disability, and medical care, notably the lack of: surgery or other medical procedures; steroids or injections; prescription pain medications; ongoing or significant impairment in range of motion; ongoing or significant loss of strength; physical therapy sessions since May 2015; obvious physical abnormalities or defects (as of October 6, 2015); and medical visits since October 6, 2015."

*Id.* Respondent emphasizes that the medical records demonstrate that petitioner's shoulder injury was improving with physical therapy, and that she has failed to explain why she did not receive steroids, take pain medication or resume physical therapy after giving birth. Resp. Brief at 6-7. Respondent notes that petitioner resumed physical therapy for her hip after she gave birth at the same rehabilitation facility she had been going to for her shoulder. Given these factors, respondent proposes a pain and suffering award of $45,000.00 and cites to a number of cases where similar amounts for pain and suffering were awarded by the special master. *See id*. at 7-8.

Petitioner requests an award of $90,000.00 for her pain and suffering. Petitioner's Brief ("Pet. Brief") at 6. Petitioner emphasizes that she was pregnant at the time of vaccination and in the months that followed and could not receive cortisone injections, prescriptions for pain medication, or an MRI. *Id*. at 2. She states that she faithfully participated in physical therapy for six weeks at which time her therapy was discontinued because it was determined that she would no longer benefit from additional physical therapy. *Id*. Seven months after vaccination, she was still experiencing pain in her left shoulder and this was confirmed by an MRI conducted on October 2, 2015, which revealed rotator cuff tendinosis and subacromial bursitis. *Id*. In her brief, petitioner argues that respondent routinely files proffers in SIRVA cases. *Id.* at 3. Petitioner cites to seven SIRVA cases where petitioner was awarded damages, including damages for pain and suffering only, from a range of $70,000 to $100,000. She references her affidavit where she describes the impact her shoulder injury has had on her life and her ability to work and care for her family.

## IV. <u>Discussion</u>

After a review of the entire record as well as the parties' briefing, the undersigned finds that $85,000.00 represents a fair and appropriate amount of compensation for petitioner's past and future pain and suffering. This amount accounts for the fact that petitioner was pregnant at the time she received the Tdap vaccination and therefore could not take advantage of the typical treatment of a shoulder injury such as prescription pain medications, steroids injections, and surgery. Moreover, the fact that petitioner was pregnant, had a child, and was limited in caring for her child due to her injury, adds value to her claim. In her affidavit, petitioner describes her frustration and the difficultly she encountered after her son was born. Pet. Ex. 5 at 2. She describes how difficult it was to nurse her newborn child and to pick him up from his crib each time he needed to be changed, or fed or comforted. *Id.* After giving birth, petitioner did undergo an MRI of her left shoulder which showed rotator cuff tendinosis and subacromial bursitis. *Id*. at 2-3; Pet. Ex. 2 at 24; Pet. Ex. 3 at 2. She relied on Dr. Tabbador's statement that there was little he could do to help her with her shoulder injury. *Id*. The medical records also show that petitioner had a "palpable" defect in her

deltoid at the vaccination site and continued evidence of an ongoing shoulder injury in October 2015, seven months after vaccination. She also continued to have positive impingement signs for a considerable period of time. The pain and suffering award takes into account these specific facts and circumstances.

The undersigned has reviewed all the cases cited by both petitioner and respondent to support their respective positions on the appropriate amount of pain and suffering. Each case is very fact specific and no single decision or award of compensation necessarily accounts for the specific circumstances in this case. However, the *Curtis* and *Ponsness* provide a frame of reference for damages here. Petitioner's attorney, Paul Brazil, was counsel of record in both those cases and provided additional details regarding the facts of those cases and the breakdown of damages in petitioner's brief. In *Curtis*, petitioner was awarded $90,000 for pain and suffering in a SIRVA claim. *Curtis v. Sec'y of Health & Human Servs.,* No. 16-85V, 2016 WL 3742299, at *1 (Fed. Cl. June 3, 2016). Petitioner explains, however, that while petitioner had two steroid injections, he did not participate in physical therapy. In *Ponsness*, petitioner was diagnosed with subacromial bursitis, received three steroid injections, and had physical therapy for seven months. She was awarded $95,000 in damages for pain and suffering. *Ponsness v. Sec'y of Health & Human Servs.,* No. 15-826V, 2015 WL 10761228, at *1 (Fed. Cl. Spec. Mstr. Dec. 18, 2015).

Based on the record as a whole, the undersigned finds that $85,000.00, is an appropriate award for pain and suffering in this case.

## V.   Conclusion

**For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $85,000.00 represents a fair and appropriate amount of compensation for petitioner's past and future pain and suffering. In addition, the undersigned finds that petitioner is entitled to compensation for $336.20 in past unreimbursed medical expenses.**

**Therefore, the undersigned awards petitioner a lump sum payment of $85,336.20, in the form of a check payable to petitioner.** This amount represents compensation for all items of damages that would be available under 42 U.S.C. § 300aa-15(a). *Id.* In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment in accordance with this decision.[3]

**IT IS SO ORDERED.**

> **s/Nora Beth Dorsey**
> Nora Beth Dorsey
> Chief Special Master

---

[3] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.